Guardianship of Jackson.[1]

No. 03-P-1151.

Franklin. May 18, 2004. - September 3, 2004.

Present: Greenberg, Porada, & Gelinas, JJ.

*Guardian,* Incompetent person. *Practice, Civil,* Guardianship proceeding. *Probate Court,* Guardian, Incompetent person. *Incompetent Person.*

In a proceeding brought by the parents of a proposed ward pursuant to G. L. c. 201, § 6, seeking a guardianship and authorization for treatment with antipsychotic medication, the judge's finding that the petitioners had failed to sustain their burden of demonstrating that, at the time of trial, the proposed ward was incompetent by reason of mental illness to manage his own personal and financial affairs, was not clearly erroneous; moreover, the judge's conclusion that the petitioners had not sustained their burden of showing that the proposed ward was not able to think or act for himself as to matters concerning his personal health, safety, and general welfare, or to make informed decisions as to his property or financial interests, was not against the weight of the evidence. [769-775]

Petition filed in the Franklin Division of the Probate and Family Court Department on February 7, 2002.

The case was heard by *Geoffrey A. Wilson,* J.

*Marilyn J. Schmidt* for the petitioners.

*Warren M. Yanoff* for the ward.

Gelinas, J. In this appeal, the petitioners, the mother and father of Jackson, essentially challenge a Probate and Family Court judge's findings (1) that they did not sustain their burden of demonstrating that, at the time of trial, their adult son was incompetent by reason of mental illness to manage his own personal and financial affairs; and (2) that they failed to show, by a preponderance of the evidence, that Jackson was not able to think or act for himself as to matters concerning his personal health, safety, and general welfare, or to make informed deci-

---

[1] A pseudonym.

sions as to his property or financial interests.[2] The petitioners also sought court authorization to treat their son with antipsychotic medication in accordance with a treatment plan. Based upon his ultimate findings, the judge dismissed the petition.

We consider the petitioners' appeal as one contending that the judge's findings were clearly erroneous, Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996),[3] and against the weight of the evidence, thus requiring a new trial.

Guardianship proceedings in the Probate Court are civil in nature. See, e.g., *Guardianship of Bassett*, 7 Mass. App. Ct. 56, 65 (1979) (matters under G. L. c. 215, § 6, are "governed by the Massachusetts Rules of Civil Procedure"). In order to prevail, the petitioners must prove their case by a preponderance of the evidence. See *Guardianship of Roe*, 383 Mass. 415, 425 (1981) (standard of proof to be applied in guardianship proceedings is the usual civil "preponderance of the evidence" standard, with the added safeguard that the judge should "carefully consider[] the evidence and enter[] specific findings indicating those factors that persuade him that a guardian is needed").

The inquiry in a proceeding for guardianship pursuant to G. L. c. 201, § 6, is twofold. The petitioners must show not only that the proposed ward is incapable of taking care of himself, but also that he is incapable of caring for himself by reason of mental illness. See *Fazio* v. *Fazio*, 375 Mass. 394, 399 (1978). Being "incapable of taking care of" oneself, as set out in G. L. c. 201, § 6, means a general inability on the part of the individual to manage his own personal and financial affairs; that is, an inability to think for himself as to matters concerning his personal health, safety and general welfare. *Id.* at 403. A judicial finding of incompetence by reason of mental illness is a necessary precondition to any order of treatment pursuant to a

---

[2]In their motion for reconsideration in the trial court, and on appeal here, the petitioners argue that the judge's finding that Jackson was competent is not supported by the evidence (in the trial court), or by substantial evidence (on appeal), and is error as matter of law.

[3]The rule provides in pertinent part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996).

substituted judgment finding. See *Guardianship of Weedon*, 409 Mass. 196, 199-200 (1991). A person is presumed to be competent unless shown by the evidence presented to be incompetent. *Lane* v. *Candura*, 6 Mass. App. Ct. 377, 382 (1978).

In attempting to show that the judge's findings are clearly erroneous, the petitioners bear a heavy burden; we will not disturb the findings of the trial judge unless "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 509 (1997), quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). See *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 191 (1999).

In order for the petitioners to prevail on their contention that the judgment was against the weight of the evidence, they must show that the judge, as finder of fact, "failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law." *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 60 (1948). We must determine that the judgment "is so markedly against the weight of the evidence as to suggest that the [finder of fact] allowed [himself] to be misled, [was] swept away by bias or prejudice, or for a combination of reasons, including misunderstanding of applicable law, failed to come to a reasonable conclusion." *W. Oliver Tripp Co.* v. *American Hoechst Corp.*, 34 Mass. App. Ct. 744, 748 (1993).

In this case, proceedings were initiated in February of 2002 by Jackson's parents, pursuant to G. L. c. 201, § 6,[4] seeking a guardianship and authorization for treatment with antipsychotic

---

[4]The statute provides in relevant part:

"(a) A parent of a mentally ill person . . . may file a petition in the probate court asking to have a guardian appointed for such mentally ill person and if, after notice as provided in section seven and a hearing, the court finds that he is incapable of taking care of himself by reason of mental illness, it shall appoint a guardian of his person and estate. The court may require additional medical or psychological testimony as to the mental condition of the person alleged to be mentally ill and may require him to submit to examination. It may also appoint one or more physicians, certified psychiatric nurse clinical specialists, or licensed psychologists, expert in mental illness, to examine such person and

medication. After an initial hearing, the court entered temporary orders. The judge ruled that Jackson was mentally ill, that he was incapable of caring for himself by reason of mental illness, that he was unable to make treatment decisions, and that, were he able to make such decisions, he would opt for treatment. The court entered temporary orders appointing the petitioners as guardians and authorizing Jackson's treatment with antipsychotic medication. The orders were to expire in June of 2002. They were then extended by agreement, and without further hearings on the merits, on June 28, September 25, and October 22, 2002, and on January 6, 2003. A hearing on the appointment of a permanent guardian was held on March 7 and March 10, 2003, resulting in the dismissal on appeal here.

The petitioners point out that Jackson had been adjudicated mentally ill at the temporary hearing in February of 2002, a little over a year before the trial, and contend that, although the evidence at trial reflected great improvement, it did not show that the improvement was sufficiently complete to render him competent to make his own psychiatric treatment decisions.[5] They note that even though he had been adjudicated mentally

---

report their conclusions to the court. . . .

". . .

"(c) No guardian so appointed shall have the authority to consent to treatment with antipsychotic medication, provided however, that the court shall authorize such treatment when it (1) specifically finds using the substituted judgment standard that the person, if competent, would consent to such treatment and (2) specifically approves and authorizes an antipsychotic medication treatment plan by its order or decree, after considering the testimony or affidavit of a licensed physician or certified psychiatric nurse clinical specialist regarding such plan. The court shall not authorize such treatment plan except after a hearing for the purpose of which counsel shall be provided for any indigent mentally ill person. Said hearing shall be held as soon as is practicable; provided, however, that if the petitioner requests a temporary order on the grounds that the welfare of the ward requires an immediate authorization of treatment with antipsychotic medications, the court shall act on such request in accordance with the procedures set forth in section fourteen."

G. L. c. 201, § 6, as amended by St. 2002, c. 22, § 2.

[5]At the initial hearing on temporary guardianship Jackson was determined to be suffering from paranoid schizophrenia. It was further determined that his condition was sufficiently grave to warrant a temporary guardianship with an order for involuntary medication. Jackson was hospitalized for approximately

ill, Jackson denied that he was mentally ill at all times, a factor that led to the judge's earlier conclusion that he was incompetent to make treatment decisions. They point to the fact that two psychiatrists, Dr. Homayoun Fahihi-Shirazi and Dr. Alice Graham Brown, testified that Jackson suffered from paranoid schizophrenia, and that he was not competent, by virtue of the mental illness, to make decisions concerning his medication. Dr. Fahihi-Shirazi had examined Jackson in connection with the temporary guardianship in February of 2002; Dr. Graham Brown's last examination had taken place about a month before trial.

There was further testimony from Dr. Bruce Goderez, a psychiatrist called by Jackson. His testimony, the petitioners contend, was flawed, as he did not review records other than those of a recent hospitalization, did not get a family history, did not speak with the physicians who had examined or treated Jackson, and admitted that he did not have enough information about him to reach a definite diagnosis. As well, the petitioners point out that Dr. Goderez's examination of Jackson took place four months before trial, at a time when his condition had improved dramatically. Finally, with respect to Dr. Goderez's testimony, the petitioners point to the fact that he did not determine that Jackson was not mentally ill, but merely offered a possible alternative diagnosis of bipolar disorder.

As to the initial court findings made in connection with the appointment of the temporary guardians, the trial judge could properly consider those determinations as relevant. He was not bound, however, by either the subsidiary or ultimate findings supporting his temporary orders, and he could consider other evidence of Jackson's mental condition as of the date of the trial, and reach a different conclusion, especially as the findings were somewhat remote in time. "The crucial issue in the c. 201, §§ 6(a) and (c), proceeding [is] whether [the proposed ward is] *currently* incapable of making informed treatment decisions. . . . The Probate Court judge could properly . . . consider as relevant the prior [] judgment, but the judge clearly could consider other evidence of the current mental condition of

one month while treatment was initiated. No aspect of those proceedings is contested in this appeal.

[the proposed ward]. Indeed, in any case where the prior judgment becomes relatively remote in time, the necessity for evidence of the proposed ward's current mental condition may become more clearly imperative." *Guardianship of Pamela*, 401 Mass. 856, 858 (1988).

At trial in this case there was extensive testimony by Jackson concerning his activities and his reaction to medication. He testified that he had not taken his medication since June, 2002, because of its side effects. The judge found that since his hospitalization in April, 2002, Jackson was more relaxed and happy, had been playing golf with his father, and had taught in a hockey clinic. At the time of trial he was enrolled in a premedical biology class at the University of Massachusetts, as well as two language classes at a community college, where he was earning straight "A's." He was also coaching a hockey team in a county hockey league approximately sixteen hours a week. The judge further found that Jackson was articulate in describing the subtle aspects of coaching, which required skills of team-building, dealing with players' parents, and encouraging both talented and less talented players.[6] The judge found that Jackson was actively involved in a charismatic religious sect, where healing, prophecy and speaking in tongues were widely practiced, and that he could distinguish between "hearing voices" and the ability to "hear" God, in the sense of understanding God's intention as it is meant for him to understand. At the time of trial Jackson was serving as music minister for Lenten services at the Newman Center at the University of Massachusetts, and as music minister at a Franciscan retreat center. He was living with his girlfriend, a Smith College language instructor and a Ph.D. candidate at the University of Massachusetts.

---

[6]Although labeled "Findings of Fact," many of the judge's "findings" are couched in terms of a report of the evidence, without indication whether he credited the evidence, or made a specific finding with respect to the facts adduced by the evidence. Such a practice can be confusing to the parties and make appellate review difficult. See, e.g., *Cummington Sch. of Arts, Inc.* v. *Assessors of Cummington*, 373 Mass. 597, 601 n.4 (1977) (fact finder should separate actual findings from any discussion of the evidence so that appellate review may be had on a clear statement of the reasons for the fact finder's action). We are satisfied that there are sufficient clear findings of fact to support the judge's ultimate conclusions and the judgment.

"[T]he authority of an appellate court, when reviewing the findings of a judge . . . , is circumscribed by the deference it must give to the decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." *Starr* v. *Fordham*, 420 Mass. 178, 186 (1995), quoting from *First Pa. Mort. Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621 (1985). The question is not whether we would have found as did the trial court, but whether on the entire evidence we are left with the definite and firm conviction that a mistake has been committed. *Ibid.* The judge's determination of weight and credibility is entitled to deference. See *Custody of Eleanor*, 414 Mass. 795, 799-800 (1993), and cases cited. Where the "judge makes one of several possible choices of what facts are supported by the evidence, the judge's choice is not clearly erroneous." *W. Oliver Tripp Co.* v. *American Hoechst Corp.*, 34 Mass. App. Ct. at 751. Here, the judge's findings indicate he considered the evidence presented, both favorable and unfavorable to the petitioners. He was not required to credit evidence favorable to them or, if credited, give it substantially greater weight than the evidence favorable to Jackson. The judge as fact finder may choose to disbelieve even evidence that is uncontroverted. See *Calderone* v. *Wright*, 360 Mass. 174, 176 (1971). The record, and the findings, reveal that the judge weighed all of the evidence.

The judge's findings clearly reflect that he considered the testimony of the three psychiatrists and that of Jackson's father. He concluded that while Jackson may have been incompetent by reason of mental illness at times in his life, the petitioners had not sustained their burden of showing that such was the case at the time of trial.

Further, in stating his conclusions of law, the judge demonstrated that he had considered and applied the various rules and principles that govern the showing of need for guardianship and substituted judgment for treatment. It is evident as well that he considered the possibility that Jackson might be found competent in most respects, but not competent to make decisions concerning his medication. *Guardianship of Roe*, 411 Mass. 666, 670 (1992).

On our review of this record, the petitioners have not

sustained their burden of showing that the judge's findings were clearly erroneous, or that his decision that they had not sustained their burden of proof was against the weight of the evidence.

*Judgment of dismissal affirmed.*