## Guardianship of Zaltman.

No. 05-P-1611.

Suffolk. January 17, 2006. - March 6, 2006.

Present: Armstrong, C.J., Laurence, & Grasso, JJ.[1]

*Guardian,* Incompetent person. *Practice, Civil,* Guardianship proceeding. *Mental Health. Probate Court,* Incompetent person. *Constitutional Law,* Assistance of counsel. *Due Process of Law,* Assistance of counsel.

This court concluded that a nonindigent ward who has been adjudged incapable of making her own medical decisions is entitled to an evidentiary hearing to demonstrate that she is competent to select counsel of her own choosing to represent her in a petition under G. L. c. 201, §§ 13 and 13A, to challenge her guardianship, where there is evidence that the interests of the ward and her guardian are adverse and that the ward may have recovered her competency, and if it is determined that the ward does not have such capacity, new, independent counsel must be appointed to represent her zealously in those statutory proceedings. [684-693]

Petition for guardianship filed in the Suffolk Division of the Probate and Family Court Department on September 7, 2004.

Motions for discharge of guardianship and to strike appearance of counsel were considered by *E. Chouteau Merrill,* J.

*Laura A. Sanford* for Marsha Zaltman.

*Paige Scott Reed* for Anne LaFleur & another.

Laurence, J. We address an issue of first impression that was left unanswered by the Supreme Judicial Court in *Guardianship of Hocker,* 439 Mass. 709, 716 n.14 (2003) (see note 9, *infra*): May a nonindigent ward who has been adjudged incapable of making her own medical decisions retain a lawyer to represent her in a petition under G. L. c. 201, §§ 13 and 13A, seeking to discharge her guardianship and remove her guardian on the grounds that the guardianship is no longer necessary because of changed medical circumstances and the guardian is not fulfilling her fiduciary duties? We hold that, in the circumstances of

---

[1]After oral argument in this case, Chief Justice Armstrong was substituted for Justice Lenk on the panel.

this case, the ward is entitled to an evidentiary hearing to determine whether she has the capacity to retain counsel for that purpose; if it is determined that she does not have such capacity, new, independent counsel must be appointed to represent her zealously in those statutory proceedings.

*Background.* A petition for guardianship of the person of Marsha Zaltman (hereinafter Ms. Zaltman or the ward) was brought by the petitioners, Anne LaFleur and Elizabeth Mac-Lellan,[2] on September 7, 2004. The petition indicated that the basis for the guardianship was mental illness rendering Ms. Zaltman incapable of taking care of herself and making her own medical decisions, and requested court authorization to treat her with antipsychotic medication.[3] On September 8, 2004, a Probate and Family Court judge appointed Attorney Rosemary Eacmen to represent Ms. Zaltman (who is not indigent) for the requisite *Rogers* proceeding. See *Rogers* v. *Commissioner of the Dept. of Mental Health,* 390 Mass. 489 (1983). On October 27, 2004, the judge allowed a temporary guardianship of Ms. Zaltman and issued an order authorizing the hospital to perform

[2]LaFleur and MacLellan are social workers employed by Massachusetts General Hospital, where Ms. Zaltman had been admitted for spine surgery. They filed the petition for her guardianship, pursuant to G. L. c. 201, § 6, as "two friends," although nothing in the record indicates any actual friendship relationship with Ms. Zaltman before or after that petition. Contrast, e.g., G. L. c. 201, § 34 (and numerous other statutes), utilizing the more specific term of art, "next friend," a status interchangeable with that of guardian ad litem, *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation (No. 4),* 424 Mass. 476, 477 n.3 (1997). To the extent the petitioners claim "next friend" status, we note that "[a] next friend is not required where there is a duly appointed guardian, unless it is clear that the interests of the guardian and the ward conflict," *id.* at 479, a circumstance that the petitioners deny here exists. The guardian, Attorney Kathleen Moore, did not submit an appellate brief or argue before this court. Although we strongly doubt that LaFleur and MacLellan had any standing after the substituted judgment proceedings or have any legally cognizable interest in, or are proper parties to, this appeal, neither Ms. Zaltman nor the guardian has challenged their participation, and we do not decide the issue.

[3]Ms. Zaltman had been diagnosed with somatization disorder (physical complaints that are not explained by reliable and objective medical diagnoses). She also has a history of chronic medical problems, including fibromyalgia, myofascial pain syndrome, and irritable bowel syndrome. Ms. Zaltman also suffered from progressive cervical stenosis and profound cervical degenerative disease. Doctors recommended that Ms. Zaltman undergo surgery but she refused or was unable to give her consent.

spine surgery and administer antipsychotic medication to her. Ms. Zaltman underwent surgery for cervical stenosis on November 11, 2004.

A petition for permanent guardianship was then filed by the petitioners, and a hearing was held on February 1, 2005. In support of the guardianship, the petitioners submitted the affidavit as to competency and proposed treatment plan of Dr. Suzanne Cullinane, dated January 11, 2005. Dr. Cullinane's affidavit was the only medical evidence presented at the hearing. Attorney Eacmen "was present," although a question has been raised regarding the effectiveness of her representation at that hearing.[4] The probate judge who had authorized the temporary guardian-

---

[4]Specifically, Ms. Zaltman alleged the following in an August 24, 2005, affidavit submitted to the judge whose orders the instant appeal challenges:

"1. Attorney Rosemary [Eacmen] was present at the hearing of my permanent guardianship case on February 1, 2005.

"2. I was present at the hearing.

"3. Atty. [Eacmen] did not tell me that I had a right to an independent evaluation. Atty. [Eacmen] did not call any witnesses on my behalf.

"4. Atty. [Eacmen] did not prepare me to testify.

"5. Atty. [Eacmen] spent less than a half hour with me the night before the hearing. She told me that if she motions with her hand it means not to say anything; that was the extent of my preparation. She did not explain the proceeding to me either before it or after it. She did not tell me I had a right to appeal the decision.

"6. I was questioned by the attorney for the hospital in a way that misconstrued what had happened leading up to my hospitalization at [Massachusetts General Hospital]. Atty. [Eacmen] did not defend me or say anything on my behalf, I was left there to hang myself. Atty. [Eacmen] said nothing in court that indicated she knew me and my situation. What she said was rote.

"7. Atty. [Eacmen] said she would come back to the hospital on the night of the hearing to explain what happened. She never came back or called me.

"8. It was recommended by [a Massachusetts General Hospital] staff person (Joanne Wooldridge) that I notify Atty. [Eacmen] when I was being discharged. I called Atty. [Eacmen] and she said that she had nothing further to do with me.

"9. I do not want Attorney [Eacmen] to represent me in the petition to discharge my guardian, Kathleen Moore.

"10. I want attorney Laura Sanford to represent me.

"11. My doctors, Erdmann, and Cullinane, have told me that I do not need a guardian. I hired Laura Sanford to represent me after they told me this."

In connection with Attorney Eacmen's alleged failings, we note that she did not file a brief in this appeal and advised this court that she would neither present an oral argument nor appear.

ship determined (specifically relying on Dr. Cullinane's submissions) that Ms. Zaltman was "incapable of taking care of herself by reason of mental illness" and "not capable of making informed decisions regarding her medical treatment" and, applying the requisite substituted judgment analysis (see *Rogers*, *supra* at 499-507), determined that, if competent, Ms. Zaltman would choose to take the antipsychotic medication recommended by her physicians. Attorney Kathleen Moore was appointed permanent guardian of Ms. Zaltman's person and had the authority to monitor the administration of antipsychotic drugs.[5] The court approved a treatment plan, to expire May 17, 2005, including such drugs. Neither the substituted judgment order nor the treatment plan order provided for periodic review of Ms. Zaltman's circumstances. See *Guardianship of Weedon*, 409 Mass. 196, 200-202 (1991).

After the surgery, Ms. Zaltman returned to her home, where she required outpatient care. That care was provided by Joanne Wooldridge of PrimeCare from November, 2004, to April, 2005, when Attorney Moore terminated the services. Sometime in June, 2005, Ms. Zaltman's physicians (Dr. Cullinane and Dr. Anthony Erdmann) informed her (so she averred in her affidavit) that she no longer needed a guardian. Ms. Zaltman thereupon decided to petition for discharge of the guardianship and retained Attorney Laura A. Sanford to represent her. On June 28, 2005, Attorney Sanford filed a petition for discharge of the guardian and termination of the guardianship on behalf of Ms. Zaltman, asserting that Ms. Zaltman was now capable of managing her own affairs. On August 12, 2005, Attorney Sanford filed an emergency motion for outpatient care, which was being denied Ms. Zaltman by her guardian, and an emergency motion for discharge of the guardianship as it was no longer necessary by virtue of Ms. Zaltman's then-present competence and conduct of the guardian detrimental to her well-being. Supporting the emergency motions was an affidavit from Dr. Cullinane, the same doctor on whose medical opinion the judge had relied at the permanent guardianship hearing.

In her affidavit, Dr. Cullinane concluded that, "It is my

---

[5]The record does not indicate that Attorney Moore had any prior relationship to Ms. Zaltman. Ms. Zaltman has two siblings but is apparently estranged from them.

opinion to a reasonable degree of medical certainty that Ms. Zaltman is [now] competent to make informed decisions regarding her care and treatment. She is rational and competent. She does not suffer from a major depressive disorder. She is organized in her thoughts and able to discuss and weigh the risks and benefits of her current treatment and outpatient care. Ms. Zaltman has an astute understanding of what is going on around her." Dr. Cullinane also observed that Dr. Erdmannn (whom Ms. Zaltman had seen several times for psychiatric evaluation and treatment) "has been of the opinion that Ms. Zaltman is competent and does not need a guardian since he first met with her about two months ago . . . [and] he has not changed his opinion." Dr. Cullinane also recommended that Ms. Zaltman work with Ms. Wooldridge of PrimeCare for outpatient care because the "alliance was clinically very beneficial for Ms. Zaltman." Dr. Cullinane stated that "Ms. Wooldridge has demonstrated her interest and involvement in Ms. Zaltman's case since the termination [of PrimeCare's services by the guardian] by staying in contact with Ms. Zaltman and with me up to the present time" and that "PrimeCare's services will provide the means for Ms. Zaltman to remain independent." The guardian, however, has refused to reinstate care from Ms. Wooldridge or PrimeCare.[6]

Hearings on the emergency motions were scheduled for August 17, 2005. On August 12, 2005, counsel for the petitioners, Attorney William Carroll, filed a motion to strike the appearance of counsel (Attorney Sanford).[7] On August 17, 2005, the hearing was convened before a second probate judge. Present were Attorneys Carroll (for the petitioners), Eacmen, and Sanford, as well as the guardian, Attorney Moore. Instead of addressing the scheduled emergency motions, however, the judge allowed the motion to strike appearance of counsel, citing *Guardianship of Hocker*, 439 Mass. 709, and stating several

---

[6]According to Dr. Cullinane, the guardian stated the following as her reasons for refusing to reinstate PrimeCare's services: "[PrimeCare's] service to Ms. Zaltman has been an expensive hand holding. Joanne Wooldridge is a 'yes' person and does whatever Ms. Zaltman wants. [PrimeCare's] charges have been fraudulent because they charged for services they did not provide." No evidence to support the guardian's assertions appears in the record.

[7]Attorney Sanford asserts that she did not receive notice of the motion to strike. No hearing date was set for that motion.

times that Ms. Zaltman, being under guardianship, "doesn't have the capacity" to hire an attorney, and adding that Ms. Zaltman "does not have the capacity to file anything." The judge cut off Attorney Sanford's attempt to present argument and denied her request for an evidentiary hearing.

Upon Attorney Eacmen's representation that she remained the ward's lawyer, the judge stated, "Ms. Eacmen, you're her representative. I expect that if there's any reason to terminate the guardianship you will bring that forward." No reference was made to Ms. Zaltman's or Dr. Cullinane's affidavit at any point during the hearing. To date, Attorney Eacmen has done nothing on Ms. Zaltman's behalf to discharge the guardianship or the guardian, to reinstate PrimeCare's services, to address the fact that the treatment plan expired as of May 17, 2005, or to seek periodic review of either the plan or the substituted judgment order.[8]

On August 25, 2005, Attorney Sanford filed a motion for reconsideration of the August 17 order striking her appearance and again requested a hearing, specifically relying on a footnote in *Guardianship of Hocker, supra* at 716 n.14.[9] Attached to the motion was an affidavit from Ms. Zaltman expressing her dis-

---

[8]At the August 17, 2005, hearing, the petitioners' attorney and the guardian vaguely alluded to plans that they "were trying to get a review together" regarding the treatment plan and the guardianship but did not explain the absence of any formal proceedings subsequent to the May 17, 2005, expiration of the treatment plan order.

[9]The Supreme Judicial Court in *Hocker* noted, 439 Mass. at 716, that, "We agree that, in certain circumstances where the guardian faces a conflict or a likelihood of conflict with a ward, [which circumstances, the court subsequently stressed, were not present in *Hocker*], Massachusetts law contemplates that the ward be represented by independent counsel." Footnote 14 was attached to that observation and stated:

> "For example, the judge is required, by statute, to appoint counsel for an indigent ward when the guardian seeks to administer antipsychotic medication to the ward, G. L. c. 201, § 6(c), or to commit the ward to a mental health facility, G. L. c. 201, § 6(b). In addition, because the ward is one of the parties allowed to seek discharge of the guardianship if the ward is no longer incompetent, G. L. c. 201, § 13, or removal of the guardian for unsuitability, G. L. c. 201, § 13A, see *Hillman* v. *Tinsley*, 355 Mass. 785, 785 (1969), the ward may be entitled to counsel consistent with S.J.C. Rule 3:10, as appearing in 416 Mass. 1306 (1993). *The interest of a guardian and a ward are perhaps at their most adverse when a petition for removal is filed, and the alleged*

satisfaction with Attorney Eacmen's representation (see note 4, *supra*). In her affidavit, Ms. Zaltman stated, "I do not want Attorney [Eacmen] to represent me in the petition to discharge my guardian, Kathleen Moore. . . . I want attorney Laura Sanford to represent me." The motion for reconsideration was denied on September 13, 2005, without findings, a hearing, or an opposition.

*Discussion.* Reversal is mandated in consequence of the second judge's declining to act on the emergency motion for discharge of the guardianship, and allowing the motion to strike appearance of counsel, all without the benefit of an evidentiary hearing. The underlying problem is reflected in the judge's pronouncement that "[t]he ward does not have the capacity to file anything." The judge thereby denied the ward her right to petition for removal of the guardianship, a right explicitly provided for and protected by statute. See G. L. c. 201, § 13, as appearing in St. 1956, c. 314, § 5 ("The guardian of a mentally ill . . . person . . . may be discharged by the probate court, upon the application of the ward or otherwise, when it appears that the guardianship is no longer necessary . . . ."); G. L. c. 201, § 13A, as appearing in St. 1974, c. 845, § 8 ("A mentally ill person under guardianship . . . may file a petition for the removal of such guardian . . . ."); *Guardianship of Roe*, 383 Mass. 415, 426 (1981) ("If an individual is erroneously subjected to guardianship, then G. L. c. 201, § 13A, al-

---

failure of the guardian to fulfill her fiduciary duties to the ward is at issue. We need not and do not determine whether an incompetent ward could retain a lawyer himself in such circumstances. See J.H. Cross, R.D. Fleischner, & J.S.J. Elder, Guardian[ship] and Conservatorship in Massachusetts § 3.18A (Supp. 2002) ('Inasmuch as the statute allows a ward to seek removal of his or her guardian, there should at least be a presumption that the ward has the capability to retain counsel for that purpose')." (Emphasis supplied.)

The *Hocker* court did not quote the sentence that immediately follows the quoted passage in the main volume: "Courts should be skeptical of challenges by a guardian to the authority of ward's counsel to appear and prosecute a petition for discharge." Cross, Fleischner, & Elder, Guardianship and Conservatorship in Massachusetts § 3.18 (2000). The same passage appears in the 2005 supplement. Cross, Fleischner, & Elder, Guardianship and Conservatorship in Massachusetts § 3.18A (Supp. 2005).

lows such a ward to file a petition for the removal of his guardian").

*Hocker*, 439 Mass. at 716 & n.14, upon which the judge relied, actually highlighted the importance of those fundamental rights of a mentally ill person in circumstances like those presented to the judge here, manifesting conflict or adverse relations between the guardian and the ward, "when a petition for removal is filed, and the alleged failure of the guardian to fulfill her fiduciary duties to the ward is [put] at issue." By peremptorily denying the ward the opportunity to vindicate her statutory rights and by ignoring evidence that at least raised the issue of a significant change in circumstances,[10] the judge failed to discharge her "ultimate decision-making responsibility" when "dealing with matters concerning a person properly under the court's protective jurisdiction," armed with inherent power "to act in the best interests of a person under its jurisdiction" so as "to afford whatever relief may be necessary to protect [such person's] interests." See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 755, 756, 758 (1977) (quotations and citations omitted). See also *Matter of Spring*, 380 Mass. 629, 641 (1980) ("even a [remote] possibility of some change of circumstances might warrant reconsideration"). The judge's rulings thus effectively denied the ward her opportunity to discharge her burden of proving her capacity and of justifying modification of the guardianship order. See *Sullivan* v. *Quinlivan*, 308 Mass. 339, 342 (1941); *Rogers*, 390 Mass. at 507.

Furthermore, in such cases a judge has an obligation that was not here discharged, that of personally ascertaining the ward's desires and intentions. "An individual's stated preference has traditionally been considered a 'critical factor' by courts in determining matters of guardianship. *Guardianship of Roe*, 383 Mass. [at 445]. See *Allis* v. *Morton*, 4 Gray 63, 64 (1855) ('it would be the duty as well as the pleasure of the court anxiously

---

[10]Particularly pertinent were the changed opinion of the very physician, Dr. Cullinane, whose input had been decisive at the permanent guardianship hearing, and the evidence of friction between the ward and both the guardian and the appointed lawyer.

to consult' the ward as to his preference of guardian) . . . ."
*Guardianship of Smith*, 43 Mass. App. Ct. 493, 499 (1997).
"Even if [the ward] lacked the capacity to make [her own]
treatment decisions at the time, [her] expressed preference 'must
be treated as a critical factor in the determination of [her] "best
interests," ' . . . since it is the patient's true desire that the
court must ascertain." *Rogers, supra* at 505, quoting from
*Guardianship of Roe*, 383 Mass. at 445. "[P]rocedural intrica-
cies and technical niceties must yield to the need to know the
actual values and preferences of the ward." *Guardianship of
Roe*, 383 Mass. at 444.

This general judicial obligation to consult the ward was
heightened here by the ward's own affidavit attesting to her
regaining of competence and to her adverse, if not hostile, rela-
tions with both the appointed guardian and the appointed at-
torney, as well as the corroborating affidavit of the principal
psychiatrist in the matter. Those submissions, reflecting not
merely the existence of adversary proceedings and fiduciary
conflict but also genuine questions regarding the ward's
competence, cried out for inquiry of the ward and further evi-
dentiary investigation by the judge. The failure to do so
constituted error. Contrast *Hocker*, 439 Mass. at 716, 717, 719
(no conflict alleged between ward and guardian, no adversary
proceedings initiated by ward, no request for evidentiary hear-
ing by ward or counsel on the outstanding motions, and no
direct evidence of change in ward's mental condition).

A third fundamental flaw was that the judge's approach in
the proceedings below appeared to assume that the ward's
condition was fixed and unchanging, notwithstanding the facts
that there had been no periodic review of the substituted judg-
ment and treatment plan orders (as should have been ordered
but was not) and that the determination of Ms. Zaltman's
incapacity was "relatively remote in time," having been made
almost ten months before the August 17, 2005, hearing.
Compare *Guardianship of Pamela*, 401 Mass. 856, 857-858
(1988) (there, the "relatively remote" adjudication of incompe-
tence had been made eight months prior to the court's determina-

tion, after evidentiary hearing, that the ward's capacity to make treatment decisions had returned).[11]

Simply because at an earlier point Ms. Zaltman had been found "incapable of taking care of herself by reason of mental illness" did not make a foregone conclusion, much less an established legal proposition, that she did not possess the competency necessary to select counsel. It is well settled that our law recognizes various levels of competency. See *Talbot* v. *Chamberlain*, 149 Mass. 57, 59 (1889) ("Both acts [of changing domicile and of making of a will] require competent mental capacity, and the decree of guardianship [of the ward on the basis of his insanity] is not conclusive of the want of capacity to do either act"); *Matter of Moe*, 385 Mass. 555, 567-568 (1982) ("A person may be adjudicated legally incompetent to make some decisions but competent to make other decisions"); *Rogers*, 390 Mass. at 495, 497 ("A person may be competent to make some decisions, but not others. . . . [Even] a person diagnosed as mentally ill and committed to a mental institution is still considered to be competent to manage his personal affairs"); *Guardianship of Bassett*, 7 Mass. App. Ct. 56, 63 (1979) (mentally retarded person requiring guardianship nevertheless had "decision-making capability" as to "some but not all of his personal affairs"). Cf. *Ensign* v. *Faxon*, 224 Mass. 145, 147 (1916) (court observed that insane person under guardianship personally had retained attorney who filed legal proceedings and rendered services in connection with the guardianship).

Similarly, as previously noted, *supra*, our courts have repeatedly held that a mentally ill person may still possess the faculties to have an informed opinion about her treatment. See *Doe* v. *Doe*, 377 Mass. 272, 278-279 (1979), quoting from *Allis* v. *Morton*, 4 Gray at 64 ("A man may be insane so as to be a fit subject for guardianship, and yet have a sensible opinion and strong feeling upon the question who that guardian shall be. And that opinion and feeling it would be the duty as well as the

---

[11]The judge's abbreviated observations at the August 17, 2005, hearing make clear her static view of the ward's situation and her refusal to acknowledge the troubling affidavits that were before her: "There has been a determination by this court that [the ward] lacks capacity"; "[t]he ward does not have the capacity to file anything"; "I expect that if there's any reason to terminate the guardianship [the appointed attorney] will bring that forward."

pleasure of the court anxiously to consult, as the happiness of the ward and his restoration to health might depend upon it"); *Guardianship of Roe*, 383 Mass. at 445 (same); *Matter of Spring*, 8 Mass. App. Ct. 831, 838 (1979), *S.C.*, 380 Mass. 629 (1980) ("when a person becomes incompetent to formulate a lucid judgment he is not thereby stripped of the right of choice enjoyed by others in the making of treatment decisions"). The fact that Ms. Zaltman was earlier found "incapable of taking care of herself by reason of mental illness" did not mean that she remained indefinitely incompetent to choose and hire (at her own expense[12]) an attorney to represent her interests, even were there no evidence of a significant change in her mental condition.[13]

In addition, the initial determination of Ms. Zaltman's incompetency had been made over ten months before the hearing at issue (and the adjudication as to a permanent guardianship over six months earlier), and it is well established that a person's competency can change over time. See *Matter of Spring*, 380 Mass. at 641 (recognition that the competency of even a profoundly disoriented ward might change over a nine-month period; however "remote . . . even a possibility of some change of circumstances might warrant reconsideration"); *Guardianship of Pamela*, 401 Mass. at 858 (eight-month interval between incompetency adjudication and determination of renewed competency). The very existence of a statutory procedure to terminate a guardianship necessarily implies that a person's incompetency may not remain static. See G. L. c. 201, §§ 13, 13A. Similarly, the factors utilized in determining a

---

[12]The appointed guardian was given no authority with respect to Ms. Zaltman's estate.

[13]In this connection, the judge's disregard of Ms. Zaltman's affidavit apparently reflected her overlooking the "not very stringent test of competence," *Commonwealth* v. *Echavarria*, 428 Mass. 593, 596 (1998), for testimonial competency in Massachusetts, where the evidence of even insane, mentally ill, and emotionally disturbed persons, persons of limited intelligence, and children as young as four can be received under the flexible "sufficient understanding" test of G. L. c. 233, § 20. See, e.g., *Commonwealth* v. *Whitehead*, 379 Mass. 640, 655-656 (1980); *Commonwealth* v. *Dockham*, 405 Mass. 618, 619 (1989); *Commonwealth* v. *Jimenez*, 10 Mass. App. Ct. 441, 443 (1980); *Commonwealth* v. *Piedra*, 20 Mass. App. Ct. 155, 159-160 (1985); *Commonwealth* v. *Sylvia*, 35 Mass. App. Ct. 310, 311-312 (1993); *Commonwealth* v. *Lamontagne*, 42 Mass. App. Ct. 213, 215-219 (1997).

ward's substituted judgment also may change over time. See *Guardianship of Linda*, 401 Mass. 783, 785-787 (1988). This reality is supposed to be embedded in the substituted judgment and the treatment orders themselves, which "must provide for periodic review of the treatment plan and of the patient's circumstances in order to ensure the appropriateness of the plan and the careful protection of the patient's rights." *Guardianship of Weedon*, 409 Mass. at 201 ("the patient's mental condition . . . may change significantly with the passage of time, thus rendering the substituted judgment determination inaccurate[, necessitating] [p]eriodic review").

In this case, the lack of judicial recognition that the documents placed before her presented "a genuine question" as to the possibility of some change of circumstance and raised a "duty . . . to ascertain the fact" as to the ward's competence, *Gershaw* v. *Gershfield*, 52 Mass. App. Ct. 81, 96 (2001), quoting from *Sullivan* v. *Judges of the Superior Ct.*, 271 Mass. 435, 437 (1930), was error. The "crucial issue" in such proceedings is "whether [the ward] was *currently* [emphasis in original] incapable of making informed treatment decisions" and ascertaining the "ward's *current* [emphasis supplied] mental condition." *Guardianship of Pamela, supra.* See *Guardianship of Jackson*, 61 Mass. App. Ct. 768, 772-773 (2004). The consequences of the judge's lack of response to the ward's petition for discharge and supporting evidence, against the background of an absence of provision for, much less actual, periodic review, was inconsistent with "the careful protection of the [ward's] rights," *Guardianship of Weedon, supra*, that should have been the judge's primary concern.[14]

That the judge expressed her expectation at the August 17, 2005, hearing that Attorney Eacmen would bring a petition to discharge the guardianship "if" there was any reason to do so was, in the circumstances, not sufficient to protect the ward's

---

[14]The judge correctly realized at the August 17, 2005, hearing that there was no review date contained in the permanent decree and inquired of the petitioners and the guardian when the review would take place. The errors we discern are her not taking action on the materials submitted on behalf of the ward to order an evidentiary review or equivalent hearing, and seeming to acquiesce in vague representations that a review would somehow take place at some future time.

rights. First, it is questionable whether Attorney Eacmen any longer actually or meaningfully represented the ward. The record indicates that she was appointed to represent Ms. Zaltman only for purposes of the *Rogers* proceeding,[15] the notice of assignment of counsel concisely limiting her charge to "Rogers"). The restricted nature of the appointment is consistent with the subsequent affidavit of Ms. Zaltman, who averred that when she called Attorney Eacmen after the permanent guardianship hearing, the attorney informed her that "she had nothing further to do with me." Attorney Eacmen's representation to the judge at the August 17, 2005, hearing, that she "still represented" Ms. Zaltman did not make the purported continued representation so, as matter of law.[16]

Even if Attorney Eacmen continued to have authority to represent Ms. Zaltman after the *Rogers* proceeding and the finding of incompetency, in light of the high fiduciary nature of such a representation the judge should have, on the reconsideration motion, examined the attorney's actual participation in the case to determine whether she adequately represented Ms. Zaltman's interests — an exploration made more urgent by Ms. Zaltman's serious charges that Attorney Eacmen failed to (1) inform her that she had a right to an independent evaluation; (2) call any witnesses on her behalf at the permanent guardianship hearing; (3) prepare her to testify; (4) inform her of her right to appeal the adverse decision; and (5) explain to her the ramifications of the decision or assist her in any way after that decision.[17] See note 4, *supra.* From all that appears, Attorney

---

[15]General Laws c. 201, § 6(*c*), as appearing in St. 1985, c. 525, § 1, does not permit a judge to authorize a ward's treatment with antipsychotic medication "except after a hearing for the purpose of which counsel shall be provided for any indigent mentally ill person." Counsel is also required to be assigned before a judge may authorize the admission or commitment of a mentally ill person. G. L. c. 201, § 6(*b*).

[16]The Supreme Judicial Court has held that Mass.R.Prof.C. 1.14, 426 Mass. 1361 (1998), "imposes no affirmative duty on an attorney appointed by a judge during guardianship proceedings to continue to represent her client after the judge has adjudicated the client to be mentally incompetent, appointed a permanent guardian for the client, and vacated the appointment." *Hocker,* 439 Mass. at 717-718.

[17]Cf. *Matter of Moe,* 385 Mass. at 567 ("The guardian ad litem is to be charged with the responsibility of zealously representing the ward, and must . . . present proof . . . and cross-examine witnesses at the hearing. . . . In

Eacmen (who did not participate in the instant appeal, see note 4, *supra*) did nothing to investigate or pursue the merits of the petition to discharge the guardianship or initiate her own petition, notwithstanding the material corroborating medical evidence, i.e., Dr. Cullinane's opinion and Dr. Erdmann's reported opinion that Ms. Zaltman had, as she claimed, regained competence. Should the ward's allegations prove true, it would be difficult to justify the failure of an attorney, charged with the fiduciary obligation of zealously representing a ward, to act in these circumstances.

In sum, on these facts, the judge's failure to hold a hearing at least to determine whether the ward was competent to retain an attorney to challenge the continuation of the guardianship constituted error of law that effectively gutted the protective provisions of G. L. c. 201, §§ 13 and 13A (if not, as argued by Ms. Zaltman, violated her due process rights under the Fourteenth Amendment to the United States Constitution and art. 12 of our Declaration of Rights, compare *Towne* v. *Hubbard*, 3 P.3d 154, 159-161 [Okla. 2000] [recognizing that guardianship is a significant restriction of a person's liberty and holding that there is a due process right to select one's own attorney in a guardianship proceeding]).

Contrary to the petitioners' principal contention (and the judge's sole legal reliance), the Supreme Judicial Court's recent opinion in *Guardianship of Hocker* does not support the judge's actions. Indeed, we view our decision as consistent with, and a logical and necessary extension of, *Hocker*. The court's rationale in *Hocker* was grounded on the fact that there were no adversary proceedings pending between the guardian and the ward (an observation the court reiterated four separate times). The court held, 439 Mass. at 717, that "[w]hen no adversary proceedings have been initiated, due process does not require that a ward be able to consult with counsel [of her choice] about [her]

order to guarantee a thorough adversary exploration of the difficult question posed, the guardian ad litem should present all reasonable arguments [against forced treatment of the ward], . . . . so that 'all viewpoints and alternatives will be aggressively pursued and examined . . . .' ") (citations omitted). Although the judge observed that the permanent guardianship proceeding "was a contested hearing," there is nothing in the record to substantiate that Attorney Eacmen's representation at that hearing met those high standards.

guardianship." The court explicitly refused, however, to pass on the question of the ward's right to independent counsel when the interests of the guardian and the ward were procedurally adverse (see note 9, *supra*) but plainly intimated that the result might well be different in such a situation. *Hocker*, 439 Mass. at 716 n.14.

The question that the Supreme Judicial Court was not faced with in *Hocker*, as noted earlier, is squarely presented here. Consistently with *Hocker*, we hold that the integrity of the statutory process for protecting a ward's rights in a guardianship requires that a nonindigent ward who has been adjudged incompetent to make her own medical decisions be given the opportunity to demonstrate that she is competent to select and retain counsel of her own choosing[18] to challenge her guardianship when there is evidence that the interests of the guardian and ward are adverse and that the ward may have recovered her competency.[19]

Finally, we observe that our holding comports with the guarantees of equality set forth in art. 1 of our Declaration of Rights and recognized in our decisional law. An incompetent person, like all other individuals, is entitled to equality and

---

[18]Under the rationale of our holding, an indigent ward would be entitled to the appointment of independent counsel for that purpose pursuant to S.J.C. Rule 3:10, as amended, 416 Mass. 1306 (1993).

[19]We note two additional, critical, facts that distinguish *Hocker* from the present case. First, the judge in that case conducted an evidentiary hearing and made specific findings as to the ward's ability to make legal decisions. *Hocker*, 439 Mass. at 712-713. Although the ward did not testify, the judge reviewed the medical records and found that "the level of assessment and reasoning required to make informed legal decisions, exceeds Hocker's ability as diagnosed by his physicians." *Ibid.* Second, there was in *Hocker* no evidence of any change in the ward's mental condition. *Id.* at 719. The only material proffered on behalf of the claim that the ward had regained his ability to make decisions regarding his legal affairs was a copy of an internet posting entitled "New Possibility of Brain Cell Regeneration in Alzheimers Disease," written by a support group and submitted as an exhibit to the son's affidavit, "evidence" described by the court as "skimpy" and "insubstantial." *Ibid.* By contrast, in this case, the judge refused to conduct an evidentiary hearing even though Attorney Sanford requested one on several occasions. Furthermore, unlike in *Hocker*, in Ms. Zaltman's case there was reliable medical evidence before the court — from the very physician whose opinion earlier had been critical in the incompetency determination — that cast doubt on Ms. Zaltman's continued incompetency.

respect.[20] See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. at 747 ("The trend in the law has been to give incompetent persons the same rights as other individuals"); *Hocker, supra* at 715 ("an adjudication of incompetency . . . does not make the ward any less worthy of dignity or respect in the eyes of the law than a competent person").

Consequently, we vacate the judge's August 17, 2005, order that effectively denied the ward's petitions for discharge of the guardianship, as well as the judge's September 13, 2005, order denying the ward's motion for reconsideration, and remand the case for the following proceedings. An evidentiary hearing must be held to determine whether Ms. Zaltman is competent to retain counsel to act on her behalf in challenging the guardianship and seeking removal of the present guardian. In connection with that evidentiary hearing, independent counsel must be appointed to represent Ms. Zaltman. If it is determined that Ms. Zaltman is competent to retain counsel, she may hire counsel of her choosing, including Attorney Sanford, to press her petitions. If Ms. Zaltman is determined not to be competent to retain counsel, independent counsel must be assigned to her (the selection of counsel to be in the judge's discretion but exercised in light of this decision). Regardless of the outcome of that hearing, based upon the evidence of changed medical circumstances presented in the record, Ms. Zaltman shall be afforded, as soon as feasibly possible, an evidentiary hearing either on the basis of her petition to discharge the guardianship or as a periodic review of the substituted judgment and treatment plan orders, at which she should be represented by counsel (of her choosing or appointed by the court, as may be appropriate) and have the opportunity to present additional evidence as to her competency.

*So ordered.*

---

[20]As the Supreme Judicial Court stated in *Saikewicz*, 373 Mass. at 746, "It does not advance the interest of the State or the ward to treat the ward as a person of lesser status or dignity than others. To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons."