GUARDIANSHIP OF L.H.

No. 11-P-1510.

Middlesex. September 18, 2012. - January 24, 2014.

Present: BERRY, BROWN, & AGNES, JJ.

*Incompetent Person,* Consent to medical treatment. *Guardian,* Incompetent
person, Consent to medical treatment. *Probate Court,* Guardian, Incompetent
person. *Practice, Civil,* Guardianship proceeding, Assistance of counsel.
*Constitutional Law,* Assistance of counsel. *Due Process of Law,* Assistance
of counsel.

At a proceeding on a petition seeking appointment of a guardian, the evidence
established by a preponderance that the ward was in need of treatment with
antipsychotic drugs, and the judge properly concluded that, if competent, the
ward would consent to such treatment; further, the judge properly reinstated
the substituted judgment treatment order with a modification for administra-
tion of antipsychotic drugs by injection. [717] AGNES, J., dissenting.
This court declined to reach the issue whether trial counsel was ineffective in
assisting the ward at a proceeding on a petition seeking appointment of a
guardian and a substituted judgment treatment order for administration of
antipsychotic drugs, as well as at a proceeding seeking reinstatement of the
substituted judgment treatment order with a modification for administration
of antipsychotic drugs by injection, where the issues were not fully developed
on the trial record, and where nothing in the extant record suggested that the
standard of prejudice would be met in the case. [717-721] AGNES, J., dissenting.

PETITION for guardianship filed in the Middlesex Division of
the Probate and Family Court Department on November 30,
2009.

The case was heard by *Peter C. DiGangi,* J., and a motion to
reinstate a substituted judgment treatment order was considered
by him.

*Laura A. Sanford* for the ward.

*Miriam H. Ruttenberg, Phillip Kassel, Richard M. Glassman,
Hillary J. Dunn, Thomas P. Murphy, & Robert D. Fleischner,*
for Mental Health Legal Advisors Committee & others, amici
curiae, submitted a brief.

BERRY, J. This case involves two substituted judgment proceedings on petitions filed, following the precedent of *Rogers* v. *Commissioner of the Dept. of Mental Health*, 390 Mass. 489 (1983), and cases decided in its wake, in respect to the administration of antipsychotic medications to L.H. L.H. appeals from a decree and findings of the Probate and Family Court that she was not competent to make medical decisions and would benefit from a proposed treatment plan to use the antipsychotic drug Risperdal, and that she would consent to use of that drug were she competent. L.H. also appeals from the judge's subsequent allowance of a motion to reinstate and to modify the treatment plan to allow for the administration by injection of Risperdal. The two appeals were consolidated here.

L.H. argues on appeal that there was insufficient evidence that the administration of antipsychotic medication was appropriate. In addition, L.H. argues that her trial counsel rendered ineffective assistance. We affirm.

For the reasons addressed in part 1, we conclude that the evidence in these substituted judgment proceedings and the probate judge's findings established by a preponderance that L.H. was in need of treatment with antipsychotic drugs. See G. L. c. 190B, § 5-306A. See generally *Guardianship of Erma*, 459 Mass. 801, 802 n.2 (2011) (discussing substituted judgment in context of involuntary administration of antipsychotic drugs). For the reasons addressed in part 2, we decline to reach the ineffective assistance of counsel claims in these direct appeals. First, such claims are not fully developed on this trial record and were not further developed in a motion for new trial. Second, based on the extant record that underlies the direct appeals, nothing has been made to appear that the standard of prejudice would be met in this particular case. A showing of prejudice is the governing standard for ineffective assistance claims in civil cases involving fundamental liberty interests in the administration of antipsychotic medication, such as presented in this case. See generally *Poe* v. *Sex Offender Registry Bd.*, 456 Mass. 801, 813 (2010), quoting from *Commonwealth* v. *Mahar*, 442 Mass. 11, 15 (2004) (prejudice in ineffectiveness claims is "a 'reasonable probability' that 'but for counsel's unprofessional errors, the result of the proceeding would have been different' ").

1. *Procedural background and trial evidence.* At the time these proceedings commenced, L.H., a fifty-seven year old woman, was living at the Lowell Health Care Center (LHCC), where she had resided since being admitted in October, 2009, having previously been a resident in a nursing home in New York. In addition to mental health issues, L.H. suffers from multiple sclerosis (MS), among other physical ailments, and requires a wheelchair. Her medical history included prior treatment with antipsychotic medication. In past times, L.H. had been homeless.

On November 30, 2009, LHCC staff members Mark O'Flaherty and John Handren (collectively, petitioners) filed a petition in the Probate and Family Court seeking appointment of a guardian for L.H. pursuant to G. L. c. 190B, § 5-303. The petition later was amended to include a proposed antipsychotic treatment plan. Because L.H. challenges the commencement of the proceedings in the first instance, we note that Dr. Anthony Joseph, a psychiatrist, completed and signed the statutorily required medical certificates and supporting documentation, all of which were filed with the court as the proceedings began. These documents, including the medical affidavit and treatment plan, detail L.H.'s physical and mental condition at the time the proceedings were commenced and, we conclude, justified the petition undertaken.[1]

A hearing was held on August 30, 2010. The witnesses included Dr. Joseph of LHCC; Dr. David Rosmarin, an independent forensic psychiatrist retained by L.H.'s court-appointed counsel; L.H.; and her court-appointed temporary guardian.

---

[1] L.H.'s argument that the petition was not warranted at the outset is countered by the medical certificate and the related documents. The petitioners state in these documents that they seek appointment of a guardian because "[L.H.] is unable to participate in Health Care decisions and is currently refusing all care which will cause declining health." Dr. Joseph stated L.H. is "very unaware of her situation and mental illness, rejects care, [and has] poor insight and judgment." He stated in his subsequent documentation that she suffers from "multiple sclerosis, atypical psychosis, [and] borderline personality disorder" and manifests symptoms such as "agitation, poor compliance with medical care, paranoia, believing that others lie about her and wish to hurt her." He explained that L.H. is an inpatient in a "neurobehavioral unit" who was referred to LHCC by the State of New York "as facilities in that state [are] unable to meet her intensive behavioral needs." He stated that antipsychotic medication is necessary to "reduce her agitation and paranoia, and improve her quality of life."

Dr. Joseph provided a psychiatric diagnosis of borderline personality disorder, mood disorder, anxiety, and excessive compulsiveness, among other mental ailments. He noted that behavioral modification treatment had been ineffective. This psychiatrist testified that treatment with an antipsychotic medicine was proposed to decrease L.H.'s agitation and paranoia so that ensuing behavioral treatment could become more effective, with the goal of returning L.H. to a supportive living environment in New York. While acknowledging that the proposed antipsychotic medicine, Risperdal, had side effects, the psychiatrist stated his medical opinion that it would be the preferred drug for L.H., and that the medication's side effects relative to its over-all effectiveness were within tolerable ranges. Specifically, the psychiatrist opined on this point as follows:

"The thing with Risperdal, the reason why I choose it is I've observed that in some people it can work very well at a very low dose and you don't get any or many side effects, which I think is the main attraction here. . . . So my first hope would be to try and treat the agitation and the paranoia with something that essentially has no side effects or actually has no side effects. So I see that potential in Risperdal. That's the logic."

Regarding L.H.'s prognosis if left untreated, Dr. Joseph predicted that she would "continue the way she is," and added that he "would be very concerned about what kind of facility she would end up in in New York, how long they would keep her."

The second psychiatric expert witness, Dr. Rosmarin, who had been retained by counsel for L.H., also stated medical opinions that tended to support the position that L.H. would benefit from the proposed treatment plan. Dr. Rosmarin had examined L.H. at length, and had spoken with LHCC staff in detail. This psychiatrist diagnosed L.H. as having a personality disorder with obsessive compulsive symptoms and suggested she could benefit from treatment with antipsychotic medicine, although at a lower dose than was proposed: "This lady needs very careful management but with a very careful behavioral plan in concert possibly with two kinds of medications. One would be a very low dose of antipsychotic. I don't have an objection to that."

L.H. testified in opposition to the treatment plan and to the use of antipsychotic medications. L.H. acknowledged that she had been homeless, suffers from MS, requires the use of a wheelchair, and needs physical assistance in her living situation. However, she did not believe guardianship was warranted, and she protested the use of antipsychotic drugs. She stated that when she previously had been treated with the proposed antipsychotic Risperdal, she had experienced severe side effects and "would rather be dead than go on [Risperdal] again."

The guardian testified he had met with L.H., consulted with LHCC staff, and spoken with L.H.'s sister on three or four occasions. Based on those discussions, the guardian stated, "I think she needs some supervision and she needs some medication."

At the conclusion of the hearing, the judge found "that the testimony of the two physicians that have been proffered to the court today are really not diametrically opposed. They both appear to me to agree that treatment is needed, continuation of the guardianship is warranted and that the treatment plan as proposed, actually by both physicians, in my opinion, involves both medical treatment, a psychotropic drug treatment, together with a behavioral treatment."

In his findings of fact, the judge acknowledged L.H.'s stated preference against the proposed antipsychotic medication, but found, listing the *Rogers* decisional factors,[2] including but not limited to possible side effects, "that if [L.H.] could rationally

---

[2]Under *Rogers*, at least six factors must be considered by a judge in arriving at the substituted judgment decision:

> "First, the judge must examine the patient's expressed preferences regarding treatment. If made while competent, such a preference is entitled to great weight unless the judge finds that the patient would have changed his opinion after reflection or in altered circumstances. . . . Second, the judge must evaluate the strength of the incompetent patient's religious convictions, to the extent that they may contribute to his refusal of treatment. . . . Third, the impact of the decision on the ward's family must be considered. . . . Fourth, the probability of adverse side effects must be considered. . . . Fifth, the prognosis without treatment is relevant to the substituted judgment decision. . . . Sixth, the prognosis with treatment must be examined. . . . Finally, the judge may review any other factors which appear relevant."

*Rogers*, 390 Mass. at 505-506 (citations omitted).

evaluate the side effect[s] described . . . , she would choose the Treatment Plan subject to the explanation that the use of the drugs would be properly managed and that . . . efforts [would be made to] continue to monitor the dosage within the lowest optimum range."[3]

Accordingly, the judge authorized the proposed treatment plan (with modifications proposed by Dr. Rosmarin and accepted by Dr. Joseph) and appointed a permanent guardian and *Rogers* monitor for L.H. The judge scheduled the treatment plan for review on December 6, 2010, the date the order was set to expire. The plan expired on schedule on December 6, 2010.

On September 1, 2011, staff of LHCC, as the petitioners, filed a motion in the Probate and Family Court to reinstate the *Rogers* order and to modify it to allow an injectable form of the antipsychotic medication to be administered because L.H. was refusing to take Risperdal orally. The testimony at this hearing reflected L.H.'s persistent mental disabilities. Dr. Joseph provided a diagnosis similar to his medical opinion at the August, 2010, hearing, i.e., that L.H. suffered from "atypical psychosis" with symptoms manifested as "paranoia, agitation, [and] dysphoria . . . . Poor insight and judgment around the treatment of her mental illness."

Dr. Joseph also supported the modification of the treatment plan modification to include injectable medication, stating, "Most likely she would become much less paranoid, much less agitated and would have a much improved quality of life in terms of her sense of well being and satisfaction." The prognosis

---

[3]The judge's comprehensive substituted judgment analysis and findings track the *Rogers* factors. That is, the judge, in pertinent part, found as follows:

"The proposed Treatment Plan is presented in good faith by Anthony Joseph, M.D. and is for the purpose of treating mental illness and not for administrative convenience. . . . [L.H.'s] preference regarding the use of anti-psychotic medication has been to reject it. This expression was made during her testimony. . . . [L.H.'s] religious beliefs do not preclude the use of the proposed treatment. . . . [L.H.'s] sister, and her family are supportive of her treatment. . . . Prognosis with medication: good. Medication should control agitation and provide her comfort. . . . Prognosis without medication: Poor. Deterioration over time."

L.H. did not voice any religious objections to the drug or reference the opinions of kin, both of which are relevant factors in an analysis under *Rogers*.

without antipsychotic medication was as follows: "Without treatment, she would continue to be agitated, dysphoric with a very impaired quality of life and . . . it's very likely she would end up in a chronic state psychiatric facility, either here or in New York."

As she had at the August, 2010, hearing, L.H. strenuously objected to antipsychotic treatment, stating, "I was refusing to take the Risperdal because of the unbearable side effects. . . . I'd rather be dead than go through that."

The judge allowed the motion to reinstate the *Rogers* order and to continue the treatment plan, and to modify the order for treatment to allow for an injectable form of drug administration.

As previously noted, this appeal concerns both the petition for guardianship and the order for administration of antipsychotic medication, as well as the reinstatement order with the modification for administration of the drug by injection.[4] In arriving at the substituted judgment decision, the judge carefully weighed the applicable factors set forth in *Rogers*, see notes 2 and 3, *supra*, including (1) L.H.'s expressed preferences to decline treatment with Risperdal; (2) consideration of L.H.'s family, including that the guardian, who endorsed the plan, had spoken with L.H.'s sister; (3) the balancing of adverse side effects against the benefits of treatment; (4) the prognosis without treatment; and (5) the prognosis with treatment. The judge also considered other relevant factors, including L.H.'s physical condition and living arrangement and the goal of greater physical independence. See *Rogers*, 390 Mass. at 505-507. Based on our review of the evidence — a great part of which we have detailed *supra* — with acknowledgment of the judge's convincingly formulated findings and analysis concerning the treatment plan after having heard all the evidence and seeing L.H. testify in two hearings, we agree that the guardianship and the treatment with antipsychotic medication were appropriate, and if competent, L.H. would consent thereto.

2. *Ineffective assistance of counsel.* In this appeal, L.H. also

---

[4]The second appeal was filed on September 23, 2011. The plan, as noted, expired on December 6, 2010. However, given the reinstatement of the treatment, the appeal is not moot. See generally *Guardianship of Erma*, 459 Mass. at 804-805.

contends that she received ineffective assistance of counsel. She raises a number of flaws in counsel's performance, including that her attorney did not adequately cross-examine Dr. Joseph (and asked questions in such an undirected manner that Dr. Joseph added information adverse to L.H.'s position); did not present Dr. Rosmarin, her psychiatric expert, in a persuasive way; allowed Dr. Rosmarin to state opinions that were not consistent with her position against the administration of antipsychotic drugs; and presented a weak closing argument in which counsel — although advocating the position that L.H. would benefit from behavioral (not drug) treatment — seemingly undermined that position by conceding that L.H. needed antipsychotic medication, although in a lesser dose than Dr. Joseph had recommended. (As noted, the modified dosage was incorporated in the judge's findings and decree.)

We bear in mind Supreme Judicial Court precedent that patients faced with the administration of antipsychotic drugs under a substituted judgment standard are entitled to the effective assistance of counsel. "[I]n a proceeding that involves a person's liberty or a fundamental liberty interest, in which a person has a right to appointed counsel, from whatever source,[5] the person is entitled to the effective assistance of counsel whether counsel is appointed or retained." *Commonwealth* v. *Patton*, 458 Mass. 119, 128 (2010). We bear in mind that issues concerning the administration of antipsychotic medications present fundamental liberty interests. "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U.S. 261, 278 (1990). "The right to refuse treatment or to discontinue treatment is based on a person's strong interest in being free from nonconsensual invasions of the

[5]The right to counsel in guardianship proceedings is set forth in G. L. c. 190B, § 5-306A(*a*), inserted by St. 2008, c. 521, § 9, which provides in part:

> "No guardian . . . of a minor or an incapacitated person shall have the authority to consent to treatment for which substituted judgment determination may be required, provided that the court shall authorize such treatment [upon specific findings]. The court shall not authorize such treatment plan except after a hearing for the purpose of which counsel shall be provided for any indigent minor or incapacitated person. . . ."

person's bodily integrity." *Guardianship of Doe*, 411 Mass. 512, 517, cert. denied, 503 U.S. 950 (1992). However, even accepting these principles, we do not deem it appropriate to reach and to try to resolve the ineffective assistance claim posed by L.H. on the limited record that underlies these direct appeals.

First, the trial record alone — absent further development by a new trial motion — does not provide us the necessary background to evaluate the attorney's tactical choices, nor his interaction with L.H., the client. On the one hand, criticism of counsel's performance is warranted, including his weak direct and cross-examination practice and an ambivalent closing argument. But then, we do not have before us what rationale drove counsel's trial strategy, nor how that strategic approach was affected by L.H.'s psychiatric expert, who seemed to share the opinion (with the petitioners' expert) that L.H. would benefit from the administration of Risperdal. Nor do we have before us information concerning counsel's dealings with an incapacitated client, and what strategic choices may have been considered by counsel in light of what would be the tone and the substance of the testimony. For example, was there consideration by counsel that to allow Dr. Rosmarin to speak about a reduced dosage of Risperdal might be a fall-back position to avoid the larger dosage advocated by Dr. Joseph? Evidence that may contradict an incapacitated person's testimony that she is adverse to any medication does not per se give rise to ineffective assistance of counsel or (as discussed *infra*) prejudice in the ultimate judgment. In short, absent what might have been probed in a new trial motion, we cannot discern on this record alone what tactical choices and what client issues may have factored into counsel's performance.

As stated in *Patton*, 458 Mass. at 128, in cases such as this, where the record is inchoate, the preferred mode to give backdrop for appellate review might have been by a motion for new trial, which, if denied, could be joined with a direct appeal. Such a new trial motion was not filed or adjudicated in this case. As the court wrote in *Patton*:

> "The principle that emerges from these cases is that in a proceeding that involves a person's liberty or a fundamental liberty interest, in which a person has a right to

appointed counsel, from whatever source, the person is entitled to the effective assistance of counsel whether counsel is appointed or retained. In addition, the outcome of that proceeding may, but need not, be attacked collaterally through a claim of ineffective assistance of counsel in a motion for a new trial."

*Ibid.*[6]

Second, and more significantly as to why we decline to reach the ineffective assistance of counsel challenge in these direct appeals, is that what does exist in the record does not reflect that a different result would have obtained, and that there was prejudice in the findings and orders. In this respect, although Supreme Judicial Court precedent looks to the *Saferian* criminal standard in assessing ineffective assistance of counsel in a civil case involving fundamental privacy issues and the administration of antipsychotic drugs in a *Rogers* context, the *Saferian* standard is modified to focus on prejudice. See *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974). The Supreme Judicial Court has so stated as follows:

> "In *Care & Protection of Georgette*, 439 Mass. 28, 33 n.7 (2003), we recognized that the language 'otherwise available, substantial ground of defense' is 'criminal law terminology that does not precisely fit' civil cases in which there is a statutory right to counsel. In civil cases, we instead 'prefer to use the term "prejudice." ' *Id.* We have defined prejudice in ineffectiveness claims as 'a "reasonable probability" that "but for counsel's unprofessional errors, the result of the proceeding would have been

---

[6]We note that even where successor or appellate counsel declines to seek a new trial simultaneously with the filing of a notice of appeal, under G. L. c. 190B, § 5-306A(c), as amended by St. 2012, c. 140, §§ 38, 39, "[e]ach order authorizing a treatment plan pursuant to this section shall provide for periodic review at least annually to determine whether the minor's or incapacitated person's condition and circumstances have substantially changed such that, if competent, the minor or incapacitated person would no longer consent to the treatment authorized therein." This is not to suggest that ineffective assistance of counsel is automatically mitigated by post hoc review. Such review adds another safeguard against the unwarranted administration of antipsychotic drugs where ineffective assistance of counsel claims in the offing are not patent on the record compiled for direct appeal, and where no new trial motion is filed.

different." ' *Commonwealth* v. *Mahar*, 442 Mass. [at 15], quoting *Strickland* v. *Washington*, 466 U.S. 668, 694 (1984)."

*Poe*, 456 Mass. at 812-813.

In this case, even given counsel's less-than-stellar performance, the evidence and the record of the proceedings, in our opinion, does not come close to meeting this legal standard of prejudice. To the contrary, taking the record as is, there is much strength in the evidence that supports the judge's decisions on substituted judgment to administer antipsychotic medications.[7,8,9]

> *Decree entered September 3, 2010, affirmed.*
>
> *Order reinstating and expanding Rogers order, entered September 9, 2011, affirmed.*

---

[7] The petitioners, the staff at LHCC, did not file an appellate brief, leaving only, as a party brief, that filed by L.H.

[8] We acknowledge the joint amicus brief of the Mental Health Legal Advisors Committee, the Disability Law Center, and the Center for Public Representation. The amici urge that we use this case to announce standards to test ineffective assistance of counsel in a case involving the administration of antipsychotic medications. The standards proposed by the amici include performance standards promulgated by the Committee for Public Counsel Services and in Mass.R.Prof.C. 1.14, as appearing in 452 Mass. 1301 (2008). For the reasons stated *supra*, we do not view this case as one in which we should reach these issues and standards.

[9] In reference to the dissent, it will suffice to state that the majority respectfully does not accept the summary of the evidence, which focuses on L.H.'s testimony but does not account for the other evidence — in particular the expert psychiatric testimony — introduced at the hearings. Nor does the majority accept that we should turn for "guidance" to the performance guidelines of the Committee for Public Counsel Services. So too, the majority does not accept as necessary turning for "guidance" to the law of other States (see, e.g., the heavy reliance in the dissent upon the decision of the New Jersey Supreme Court in *Matter of M.R.*, 135 N.J. 155 [1994], and the reliance on the law of other State cases in note 5, *post*). The majority, of course, agrees that the Massachusetts Rules of Professional Conduct operate ex proprio vigore in this case. But, even assuming that the standards of the ethical rules were not met by counsel — a point that we reject — that would not change the final result because, based on the evidence, the controlling prejudice standard was not met, as discussed *supra*. Finally, the majority rejects the dissent's proposal that we should sua sponte order a new trial, when no new trial motion was filed in the Probate and Family Court.

AGNES, J. (dissenting). With a significant loss of liberty and her own bodily integrity at stake, L.H., though represented by appointed counsel throughout these proceedings, was left without an advocate for her interests, and was forced to express those interests herself in the face of cross-examination, expert testimony, and argument against her by her own counsel. While L.H. repeatedly asserted that the side effects of the antipsychotic medication caused "anxiety [and] despair" and felt like "torture," and that she would "rather be dead" than take it, her counsel took the position of the adversary, Lowell Health Care Center (LHCC), specifically, two staff members of LHCC (collectively, petitioners). Just as L.H.'s counsel and expert advocated, the August 30, 2010, hearing resulted in orders for her guardianship and for the involuntary administration of an antipsychotic drug, Risperdal. The majority maintains that despite this predicament, L.H. was not deprived of the effective assistance of counsel because the record does not reveal whether her counsel's actions were strategic and, in any case, because there was ample evidence to support the Probate and Family Court judge's decisions. I disagree. When a client's interests are not represented by her attorney and a judge's decision relies upon testimony and argument arising from the client's attorney's deficient representation,[1] the client suffers prejudice and is denied the effective assistance of counsel. Accordingly, I respectfully dissent.

a. *L.H.'s attorney knew his client's interests.* Over the course of three hearings, L.H. made her position clear to counsel and to the judge. At an abbreviated hearing on August 16, 2010, L.H. expressed her unequivocal opposition to the administration of antipsychotic medications. At the hearing on August 30, 2010, she testified that she had taken a low dose of Risperdal a few years earlier for a several-month period and had experienced "severe side effects" including loss of bladder control, vision problems, pain, anxiety, and despair. She added, "I'd rather you kill me than go through that again." L.H. also indicated that as

[1]The lack of opposition by L.H.'s counsel and expert was the basis for the judge's determination. The judge explained that "the testimony of the two physicians that have been proffered to the court today are really not diametrically opposed."

far back as the 1980s, before she was diagnosed with multiple sclerosis (MS), she had taken an antipsychotic medication called Haldol, which also caused severe side effects. At the end of the hearing, L.H. asked to address the judge and restated her concerns about the side effects of antipsychotic medications. She stated, "I'd rather be dead. . . . [P]lease don't let them hurt me . . . . I can't go back there. I'm begging for my life." L.H. also testified at the reinstatement hearing on September 1, 2011, and described the side effects she had experienced from Risperdal. She said, "I had extreme exacerbation of my anxiety and my migraine variance, which made me . . . catatonic." She added, "I started chewing my mouth hours at a time," and "I've had . . . these reactions to similar medications before." She explained that her refusal to take Risperdal was "because of the unbearable side effects," adding, "I'd rather be dead than go through that." She described her condition as follows: "I'm not psychotic, I am not paranoid. I am neurotic, I'm anxious, I'm traumatized." To conclude her testimony, she said, "Your Honor, the reason I came here today, as sick as I am, is, again, when I was last here I told you I was on these medications before with disastrous consequences." In short, L.H. was familiar with the effects of antipsychotic medication and was strongly opposed to taking them.

b. *Right to refuse medical treatment.* Under Massachusetts law, every person has the right to accept or to reject medical treatment, even when the decision is contrary to the express wishes of qualified medical personnel acting in what they consider to be the person's best interests. See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 738-739, 745 (1977); *Guardianship of Roe*, 383 Mass. 415, 433-435 (1981); *Harnish* v. *Children's Hosp. Med. Center*, 387 Mass. 152, 154 (1982). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint and interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co.* v. *Botsford*, 141 U.S. 250, 251 (1891).[2] Moreover, there are "few legitimate medical procedures

---

[2]The United States Supreme Court long has stressed the "significant liberty

which are more intrusive than the forcible injection of antipsychotic medication." *Guardianship of Roe, supra* at 436.[3]

This right is enjoyed equally by those who may be incompetent as well as by the competent "because the value of human dignity extends to both. . . . To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons." *Rogers v. Commissioner of the Dept. of Mental Health*, 390 Mass. 489, 499-500 (1983), quoting from *Saikewicz*, 373 Mass. at 745-746. When, due to mental illness, a person lacks the capacity to consent to medical treatment, the methodology to preserve and to implement free choice and self-determination is substituted judgment. In proceedings both for guardianship and for treatment based on substituted judgment, a judge has an obligation to determine, whenever it is possible, the allegedly incapacitated person's "desires and intentions." *Guardianship of Zaltman*, 65 Mass. App. Ct. 678, 685 (2006). In fact, the incapacitated person's personal preference is regarded as a "critical factor" in the judge's decision:

> "An individual's stated preference has traditionally been considered a 'critical factor' by courts in determining mat-

interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment [to the United States Constitution]." *Washington* v. *Harper*, 494 U.S. 210, 221-222 (1990). Likewise, the Supreme Judicial Court has "consistently respected the right of a person to be free from nonconsensual invasion of bodily integrity." *Matter of Moe*, 385 Mass. 555, 564 (1982). This principle is derived from our understanding that individual choice and self-determination are "fundamental constituents of life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice." *Saikewicz, supra* at 742.

[3]"Although psychotropic drugs are effective in reducing thought disorder and may benefit the patient by allowing her to participate in other types of treatment, the drugs also may have serious short term side-effects, including blurred vision, dry mouth and throat, constipation, diarrhea, dizziness, slowing of the thought processes, weight gain, loss of sexual desire, akathesia (inability to stay still), and Parkinsonisms (drooling, muscle stiffness, rigidity, shuffling gait, tremors). . . . Neuroleptic malignant syndrome also may develop as a side effect, in the form of fever, skeletal rigidity, tachycardia, and alterations in consciousness including delirium, mutism, stupor and coma." *Guardianship of Boyle*, 674 A.2d 912, 917 (Me. 1996) (Lipez, J., dissenting).

> ters of guardianship. . . . Even if [the ward] lacked the capacity to make [her own] treatment decisions at the time, [her] expressed preference 'must be treated as a critical factor in the determination of [her] "best interests," ' . . . since it is the patient's true desire that the court must ascertain. . . . [P]rocedural intricacies and technical niceties must yield to the need to know the actual values and preferences of the ward."

*Id.* at 685-686 (citations omitted).

The law acknowledges that there are differing degrees of incapacitation, that among those who are found to be incapacitated and in need of guardianship there are persons who have "decision-making capability" as to some though not all of their personal affairs, and that "a mentally ill person may still possess the faculties to have an informed opinion about her treatment." *Id.* at 687 (citations omitted). See *Matter of Spring,* 8 Mass. App. Ct. 831, 838 (1979), *S.C.,* 380 Mass. 629 (1980) ("when a person becomes incompetent to formulate a lucid judgment he is not thereby stripped of the right of choice enjoyed by others in the making of treatment decisions"). In short, L.H. had a right to assert her refusal of treatment, and to have that refusal considered by the judge.

c. *Counsel's duty to represent L.H.'s interests.* Although L.H.'s right to counsel is based on provisions of the Massachusetts Uniform Probate Code, specifically, G. L. c. 190B, §§ 5-106(*a*) and 5-306A(*a*), her counsel's obligations are defined by common and constitutional law, and rules established by the Supreme Judicial Court.

1. *Case law.* An observation in the very helpful amicus brief, submitted jointly by the Mental Health Legal Advisors Committee, the Disability Law Center, and the Center for Public Representation, deserves emphasis: "[e]mpirical studies establish that the quality of counsel is the single most important factor determining the disposition of hearings related to involuntary medical care."[4] The emerging consensus of the State courts that have considered the issue in recent years is that the "attorney's role is not to determine whether the client is competent to make

---

[4]See Morris, Pursuing Justice for the Mentally Disabled, 42 San Diego L. Rev. 757, 769 (2005).

a decision, but to advocate the decision that the client makes."
*Matter of M.R.*, 135 N.J. 155, 176 (1994).[5]

In *Matter of M.R.*, the New Jersey Supreme Court explained
why it is vital that the lawyer represent the stated interests of a
client who may be under a disability:

> "Advocacy that is diluted by excessive concern for the
> client's best interests would raise troubling questions for
> attorneys in an adversarial system. An attorney proceeds
> without well-defined standards if he or she forsakes a
> client's instructions for the attorney's perception of the

---

[5]Accord *Gross* v. *Rell*, 304 Conn. 234, 269 (2012) ("governing standard for
the representation of impaired adult clients is not the protection of their best
interests, but, to the extent possible, the zealous advocacy of their expressed
preferences. This is true even if the Probate Court has appointed a conservator
for the client"); *Estate of Leonard v. Swift*, 656 N.W.2d 132, 142 (Iowa 2003)
("More specifically, a guardian ad litem serves the court, *advising the court*,
after an impartial investigation, of any defense to the action held by the ward.
In contrast, the attorney represents the ward and must *advise the ward* of his
rights and ensure that those rights are protected by making certain the proceed-
ings comply with the statutory and constitutional requirements of Iowa law. In
summary, the guardian ad litem advocates for the best interests of the ward,
whereas an attorney advances the wishes of the ward"); *In re Lee*, 132 Md.
App. 696, 718, 721 (2000) ("The duties of an attorney may at times directly
conflict with the duties of a guardian *ad litem*. It is the role of an attorney to
explain the proceedings to his client and advise him of his rights, . . . keep
his confidences, . . . advocate his position, . . . and protect his interests. . . .
The duty to maintain 'as far as reasonably possible . . . a normal client-
lawyer relationship' precludes an attorney from acting solely as an arm of the
court, somewhat in the nature of a special master, and using his assessment of
the 'best interests' of the client to justify waiving the client's rights without
consultation, divulging the client's confidences, disregarding the client's
wishes, and even presenting evidence against him or her"); *Orr* v. *Knowles*,
215 Neb. 49, 53 (1983) ("The Code of Professional Responsibility establishes
that an attorney must zealously represent the wishes of his or her client. . . .
It is not the role of an attorney acting as counsel to independently determine
what is best for his client and then act accordingly. Rather, such an attorney is
to allow the client to determine what is in the client's best interests and then
act according to the wishes of that client within the limits of the law");
*Guardianship of Stevenson*, 825 N.W.2d 911, 914-915 (S.D. 2013) ("Tradi-
tionally, an attorney is appointed to zealously advocate for a protected person's
wishes, regardless of whether those wishes are in that person's best interests.
A court representative [or guardian ad litem], on the other hand, is appointed
to act in a protected person's best interests"); *Guardianship of Jennifer M.*,
323 Wis. 2d 126, 133 (Ct. App. 2009) ("A ward's adversary counsel 'shall be
an advocate for the *expressed wishes* of the . . . ward' "), quoting from Wis.
Stat. § 54.42(1)(b).

client's best interests . . . . Further, 'if counsel has already
concluded that his client needs "help," ' he is more likely
to provide only procedural formality, rather than vigorous
representation. . . . Finally, the attorney who undertakes
to act according to a best-interest standard may be forced
to make decisions concerning the client's mental capacity
that the attorney is unqualified to make."

*Id.* at 176-177.[6]

2. *Massachusetts Rules of Professional Conduct.* Supreme
Judicial Court Rule 3:07, as appearing in 426 Mass. 1303
(1998), i.e., the Rules of Professional Conduct, directly ad-
dresses the obligations of counsel in cases "when a client's
capacity to make adequately considered decisions . . . is dimin-
ished . . . because of . . . mental impairment." Mass.R.Prof.C.
1.14(a), as appearing in 452 Mass. 1301 (2008). Rule 1.14 pro-
vides that "the lawyer shall, as far as reasonably possible, main-
tain a normal client-lawyer relationship with the client." This
means that when an attorney represents a client with diminished
capacity due to mental illness, counsel still has the duties to
provide competent representation, see Mass.R.Prof.C. 1.1, 426
Mass. 1308 (1998); to seek the lawful objectives of the client, see
Mass.R.Prof.C. 1.2, 426 Mass. 1310 (1998); to act reasonably
diligently and to represent her zealously, see Mass.R.Prof.C. 1.3,
426 Mass. 1313 (1998); to maintain communications with and
advise the client, see Mass.R.Prof.C. 1.4, 426 Mass. 1314 (1998);
and to maintain client confidences as far as reasonably possible,
see Mass.R.Prof.C. 1.6, 426 Mass. 1435 (1998).[7]

---

[6]The due process model of adversarial representation is not less suited to
guardianship and other mental health proceedings because there is so often a
focus on medical and psychiatric issues in such cases. "It is precisely the
subtleties and nuances of psychiatric diagnoses that justify the requirement of
adversary hearings." *Vitek* v. *Jones*, 445 U.S. 480, 495 (1980) (citation omitted).
Also, it is important to consider that a "consistent finding[] in the procedural
justice literature is that the sense of fairness that arises out of genuinely adver-
sarial proceedings evokes greater satisfaction with the outcome and more ac-
ceptance of the verdict, even by the losing party." Stransky, Civil Commit-
ment and the Right to Refuse Treatment: Resolving Disputes From a Due
Process Perspective, 50 U. Miami L. Rev. 413, 441 (1996).

[7]The rules provide further guidance when the lawyer believes the client's
diminished capacity creates certain defined risks. See Mass.R.Prof.C. 1.14(b).
Comment 7 to rule 1.14, amended in the wake of *Care & Protection of*

It should be noted that in circumstances in which a lawyer concludes that the client "insists upon pursuing an objective that the lawyer considers repugnant or imprudent," the Rules of Professional Conduct permit the lawyer to withdraw from the representation. Mass.R.Prof.C. 1.16(b)(3), (c), 426 Mass. 1369 (1998). See, e.g., *Red Dog* v. *State*, 625 A.2d 245, 247 (Del. 1993) (attorney allowed to withdraw from representation of criminal defendant who made deliberate decision to accept death penalty). No motion to withdraw was filed in this case. Until a motion to withdraw is allowed, counsel's duty of zealous advocacy is paramount.

3. *Committee for Public Counsel Services performance standards.* A third source of important guidance to Massachusetts lawyers who face the challenge of representing a client with diminished capacity due to mental illness in substituted judgment proceedings is the Committee for Public Counsel Services (CPCS). Pursuant to G. L. c. 211D, §§ 6(*b*) and 9, CPCS has promulgated "performance standards governing the representation of indigent adults in guardianship proceedings under G. L. c. 190B (including 'substituted judgment' matters) and in authorization to treat proceedings under G. L. c. 123" (CPCS guidelines), which "describe the steps which must, at a minimum, be taken by an attorney" assigned to represent an adult client in guardianship proceedings as well as in proceedings seeking the authority to administer antipsychotic medication. Guideline 1 states that counsel for L.H. "must oppose the [substituted judgment] petition and present 'all reasonable alternatives' to the proffered treatment."[8,9] Furthermore, guideline 12 states that counsel must "act as a zealous advocate for the client, insuring

*Georgette*, 439 Mass. 28 (2003), outlines options available to counsel in circumstances when "achieving the client's expressed preferences would place the client at risk of a substantial harm." On the record before us, there is no evidence that L.H. was at risk of substantial harm (physical, financial, or otherwise) if she did not receive treatment with antipsychotic medication. The petitioners described the purpose of seeking consent to administer antipsychotics as simply to improve the quality of her life to enable her to move to an environment less restrictive than that of a nursing home.

[8]Guideline 1 states as follows: "The role of counsel is to diligently and zealously advocate on behalf of his or her client, within the scope of the assignment, to ensure that the client is afforded all of his or her due process and other rights. To that end, only in exceptional circumstances may counsel stipulate to the client's incapacity; provided, however, that in proceedings in

that proper procedures are followed and that the client's interests are well represented."[10]

Under both Mass.R.Prof.C. 1.14 and the CPCS guidelines, any differences notwithstanding, a lawyer in a guardianship case must oppose the petition and must zealously advocate for the client. More specifically, pursuant to guideline 12, the lawyer must "(a) file any and all appropriate motions and legal memoranda, including but not limited to motions regarding the assertion of privileges and confidential relationships, and the admission, exclusion or limitation of evidence; (b) present and cross-examine witnesses, and provide evidence in support of the client's position; (c) make any and all appropriate evidentiary objections and offers of proof, so as to preserve the record on appeal; and (d) take any and all other necessary and appropriate actions to advocate for the client's interests."

The adversarial model does not place counsel for a mentally

which a substituted judgment determination is required, counsel must oppose the petition and present 'all reasonable alternatives' to the proffered treatment for the court's consideration. See *In the Matter of Moe*, 385 Mass. 555, 567 (1982); *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 757 (1977). Further, under G. L. c. 190B, upon a finding of incapacity, the probate court is required to ['] exercise [its] authority . . . so as to encourage the development of maximum self-reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's limitations or other conditions warranting the procedure.['] G. L. c. 190B, § 5-306(*a*). Thus, full or plenary guardianship is to be the exception, rather than the rule. To that end, counsel must ensure that, in those cases in which his or her client is found to be incapacitated, the guardian's authority is strictly tailored to the specific decision-making needs of the client."

[9]The CPCS guidelines permit counsel to stipulate to a client's incapacity in exceptional circumstances. This is not a case in which L.H.'s life was at risk or in which she faced some other irreversible loss so as to bring it within the exception.

[10]Guideline 12 states as follows: "During the hearing the attorney shall act as a zealous advocate for the client, insuring that proper procedures are followed and that the client's interests are well represented. To that end, the attorney shall: (a) file any and all appropriate motions and legal memoranda, including but not limited to motions regarding the assertion of privileges and confidential relationships, and the admission, exclusion or limitation of evidence; (b) present and cross-examine witnesses, and provide evidence in support of the client's position; (c) make any and all appropriate evidentiary objections and offers of proof, so as to preserve the record on appeal; and (d) take any and all other necessary and appropriate actions to advocate for the client's interests."

ill or even incompetent client in an ethical quandary. In the adversarial model, there will be a decision by a neutral and detached judge that is the product of evidence produced with the aid of vigorous advocacy from a petitioner's counsel and a client's counsel, as well as input from the guardian ad litem. It is simply not the role of the client's counsel to assume responsibilities that belong to others.

d. *Counsel failed to represent L.H.'s interests.* My analysis of counsel's representation focuses on two hearings: one held on August 30, 2010, and a second held on September 1, 2011. At both hearings, L.H.'s counsel actively worked against her interests.

1. *August 30, 2010, hearing.* At this hearing, counsel for the petitioners informed the judge that in addition to a permanent guardianship, they also sought approval to treat L.H. with Risperdal. One of the petitioners' witnesses was Dr. Anthony Joseph, a psychiatrist. On cross-examination of Joseph, L.H.'s counsel went farther than petitioners' counsel and elicited information about Joseph's role at LHCC, his interactions with L.H., her medical and psychiatric history, and the basis for his opinion that she required antipsychotic medication. When prompted by L.H.'s counsel, Joseph gave examples of her paranoid behavior from his personal interactions with her, such as her belief that staff persons at LHCC had tried to harm her. Joseph also was given the opportunity to expand upon his own recommended treatment using antipsychotic medication and to explain how it would have only a few side effects.

Counsel for L.H. also called Dr. David Rosmarin as an expert witness. With Rosmarin's testimony, counsel severely damaged his client's position. Contrary to L.H.'s explicit and consistent wishes, her counsel elicited from Rosmarin his view that she was not credible, that she presently was incapable of living independently in the community, that she needed to have a guardian, and that she needed behavioral treatment and antipsychotic medication. Rosmarin testified, in a narrative style, that L.H. suffers from MS, and added that she was "intentionally uncooperative on physical exam" and was "malingering additional effects of weakness." He noted that L.H. did not have significant cognitive impairment from MS, but "contrary to her testimony" she was

84 Mass. App. Ct. 711 (2014)   731

Guardianship of L.H.

admitted to the mental health system in New York because her apartments "were uninhabitable from a hygienic point." Rosmarin testified further that L.H. has "psychiatric overlays" to her MS, including a "personality disorder" that "grades into, briefly, paranoia." He added that she was either "lying" about the abuse she suffered in an effort to get out of LHCC or paranoid. Rosmarin opined that L.H. needed a "strict behavioral program" as opposed to her current program, which he believed was too willing to meet her "bizarre" demands. As for medications, Rosmarin opined that she needed "a very low dose of antipsychotic[s]."

In his closing argument, L.H.'s counsel conceded his client's position. He argued that "she needs behavioral treatment more than and perhaps instead of the antipsychotic medications." However, he then agreed with the judge that L.H.'s expert indeed had testified that she also needed antipsychotic medication, adding only that Rosmarin favored a lower dose of it than Joseph.

The lack of opposition by L.H.'s counsel and expert was the basis for the judge's determination. At the hearing, the judge stated that "the testimony of the two physicians that have been proffered to the court today are really not diametrically opposed. They both appear to me to agree that treatment is needed, continuation of the guardianship is warranted, and that the treatment plan as proposed, actually by both physicians, in my opinion, involve both medical treatment, a psychotropic drug treatment, together with a behavioral treatment."[11]

2. *September 1, 2011, hearing.* On September 1, 2011, the judge conducted a hearing on the petitioners' motion to reinstate the *Rogers* order, which had expired in December, 2010.

---

[11]Thereafter, the judge made detailed findings and rulings that include a finding that L.H. "is not capable of caring for herself by reason of mental illness" and is "not competent to make informed decisions" regarding her treatment with antipsychotic medications, and that her substituted judgment would be to choose the treatment plan calling for the administration of antipsychotics. The judge signed orders implementing the treatment plan and appointing Thomas B. Concannon as the permanent *Rogers* monitor. The *Rogers* order was due to expire on December 6, 2010. See G. L. c. 190B, § 5-306A(*c*) (requiring annual review of *Rogers* order). Following a hearing conducted on September 1, 2011, the *Rogers* order was reinstated and extended. The treatment plan, including the administration of antipsychotic medication by injection, remains in effect. Thus, this case is not moot.

Counsel for the petitioners informed the judge, without objection, that the original order was the result of an "uncontested" proceeding, and that LHCC wanted both to reinstate the order and to obtain approval for the administration of Risperdal by injection as opposed to orally because L.H. was "refusing periodically" to take her medication.

Counsel also failed to object to the hearsay testimony by Thomas B. Concannon, the guardian and *Rogers* monitor. When asked if he had "an opinion with regard to the proposed amendment to put the intramuscular Risperdal on the *Rogers* treatment," he answered, without objection, "From talking to the social workers, I think it's worth trying."

The final witness to testify was L.H. After repeating some of her earlier complaints, and being assured by the judge that she had been heard, L.H.'s lawyer addressed this remark to his client: "You need to understand that he's not listening to anything more. I told you you had to stop. I said stand up, speak up, shut up." The judge ruled that, based on the testimony of the three witnesses, the *Rogers* order was reinstated and expanded.

e. *Prejudice to L.H. by counsel's failure to represent her interests.* Ordinarily, a claim of ineffective assistance of counsel will not be considered for the first time on appeal. *Commonwealth* v. *Zinser*, 446 Mass. 807, 811 (2006). However, "when the factual basis of the claim appears indisputably on the trial record," the rule is more flexible. *Commonwealth* v. *Keon K.*, 70 Mass. App. Ct. 568, 573-574 (2007). See generally *Commonwealth* v. *Frisino*, 21 Mass. App. Ct. 551 (1986). See also *In re V.V.*, 349 S.W.3d 548, 587-588 (Tex. App. 2010) (noting "shocking brevity" of petitioner's parental rights termination trial; among counsel's numerous failings was failure to object to prejudicial evidence offered against client). As noted *supra*, counsel for L.H. (1) failed to object to prejudicial hearsay testimony by Concannon; (2) failed to object to Concannon's unqualified expert opinion that L.H. "needs some medication"; (3) enhanced the weight of the testimony by Joseph on direct examination as to L.H.'s incapacity and need for antipsychotic medication by filling in the missing gaps through cross-examination of Joseph;[12] (4) severely damaged the position he

---

[12]L.H.'s counsel also failed to recognize the distinction between a "defini-

outlined in his opening statement (opposition to the administration of any antipsychotics) by calling Rosmarin as a witness and allowing him to testify in a narrative form that (a) L.H. was not credible; (b) she required a guardian and needed the administration of antipsychotics (albeit in a dose lower than that recommended by Joseph); and (c) in most respects he agreed with and supported the assessment and recommendations made by Joseph; and (5) effectively conceded in an exchange with the judge that it would be appropriate for L.H. to be given some dose of an antipsychotic. Counsel, in effect, conceded the truth of the petitioners' case.

Just as "unauthorized concessions of guilt" may constitute presumptive prejudice for purposes of ineffective assistance claims in criminal cases, *Commonwealth* v. *Velez*, 77 Mass. App. Ct. 270, 277 n.9 (2010), prejudice should be found in guardianship proceedings involving a request for a *Rogers* order in which the client has unequivocally and consistently opposed the administration of antipsychotics, but L.H.'s counsel, in effect, concedes that she would benefit from the administration of some dose of antipsychotic medication.[13,14]

Nothing useful would be accomplished by remanding this case for a factual inquiry by the judge because the decisions made by L.H.'s counsel were contrary to the express wishes of his client, and thus manifestly unreasonable. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977) (there may be cases "where the defense was so botched" that there would be no value in factual inquiry as to prejudice).

f. *Conclusion.* In *Commonwealth* v. *Saferian*, 366 Mass. 89 (1974), the Supreme Judicial Court rightly warned that if the doctrine of ineffective assistance of counsel developed into a

tive diagnosis" and an "initial impression." *Commonwealth* v. *Waite*, 422 Mass. 792, 804 (1996).

[13]In addition, L.H.'s counsel failed to move for a directed finding at the close of the evidence, thus precluding appellate review of the sufficiency of the evidence. See *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 125 (1986).

[14]This is not a case like *Care & Protection of Georgette*, 439 Mass. at 34-35, where the court agreed with the Appeals Court's reasoning that, even with counsel's failings, the evidence of parental unfitness was so strong that it was "implausible that the most zealous and impassioned" advocacy would have made any difference.

right to a new trial whenever it is demonstrated that counsel's performance was deficient when measured against that of the reasonably competent attorney, judges "would become Penelopes, forever engaged in unravelling the webs they wove." *Id.* at 99, quoting from *Jorgensen* v. *York Ice Mach. Corp.*, 160 F.2d 432, 435 (2d Cir.), cert. denied, 332 U.S. 764 (1947). However, apart from whether I believe the outcome of a new trial would be different, the integrity of the adversarial process is at risk when counsel's deficiencies suppress the expression of his client's interests. As the Montana Supreme Court observed when addressing a similar issue in *Matter of K.G.F.*, 306 Mont. 1, 14 (2001):

> "However enlightened we, as a society, may have become in the intervening 75 years since *Buck* v. *Bell*, [274 U.S. 200 (1927),] we must nevertheless be cautious and critical of signs of paternalism legitimized by the *parens patriae* doctrine, where State actors purport to have an absolute understanding of what is in the best interests of an individual, whose liberty, dignity and privacy are at issue, and whose voice is muted by the swift and overriding authority of court-appointed professionals."

To ensure that the right to effective assistance of counsel does not become a hollow promise, it is imperative that we order a new trial when, as in this case, the record demonstrates that court-appointed counsel not only failed to advocate for his client's interests, but became an advocate for the very position his client opposed. For the within reasons, I respectfully dissent.[15]

---

[15]More specifically, I believe we should vacate the order of guardianship, the orders establishing a treatment plan authorizing treatment by means of antipsychotic medications, and the appointment of a permanent guardian and *Rogers* monitor. Furthermore, I believe the case should be remanded to the Probate and Family Court for the appointment of new counsel and, if the judge deems it advisable, a new temporary guardian for L.H.